# THE PAQUETE HABANA.

## THE LOLA.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR
THE SOUTHERN DISTRICT OF FLORIDA.

Nos. 395, 396.  Argued November 7, 8, 1899. — Decided January 8, 1900.

Under the act of Congress of March 3, 1891, c. 517, this court has jurisdiction of appeals from all final sentences and decrees in prize causes, without regard to the amount in dispute, and without any certificate of the District Judge as to the importance of the particular case.

International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination.  For this purpose, where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.

At the present day, by the general consent of the civilized nations of the world, and independently of any express treaty or other public act, it is an established rule of international law that coast fishing vessels, with their implements and supplies, cargoes and crews, unarmed, and honestly pursuing their peaceful calling of catching and bringing in fresh fish, are exempt from capture as prize of war.  And this rule is one which prize courts, administering the law of nations, are bound to take judicial notice of, and to give effect to, in the absence of any treaty or other public act of their own government in relation to the matter.

At the breaking out of the recent war with Spain, two fishing smacks — the one a sloop, 43 feet long on the keel and of 25 tons burden, and with a crew of three men, and the other a schooner, 51 feet long on the keel and of 35 tons burden, and with a crew of six men — were regularly engaged in fishing on the coast of Cuba, sailing under the Spanish flag, and each owned by a Spanish subject, residing in Havana; her crew, who also resided there, had no interest in the vessel, but were entitled to shares, amounting in all to two thirds, of her catch, the other third belonging to her owner; and her cargo consisted of fresh fish, caught by her crew from the sea, put on board as they were caught, and kept and sold alive.  Each vessel left Havana on a coast fishing voyage, and sailed along the coast of Cuba about two hundred miles to the west end of the island; the sloop there fished for twenty-five days in the territorial waters of Spain; and the schooner extended her fishing trip a hundred

miles farther across the Yucatan Channel, and fished for eight days on the coast of Yucatan. On her return, with her cargo of live fish, along the coast of Cuba, and when near Havana, each was captured by one of the United States blockading squadron. Neither fishing vessel had any arms or ammunition on board; had any knowledge of the blockade, or even of the war, until she was stopped by a blockading vessel; made any attempt to run the blockade, or any resistance at the time of her capture; nor was there any evidence that she, or her crew, was likely to aid the enemy. *Held*, that both captures were unlawful, and without probable cause.

THE cases are stated in the opinion of the court.

*Mr. J. Parker Kirlin* for appellants.

*Mr. Assistant Attorney General Hoyt* for the United States.

*Mr. Joseph K. McCammon* and *Mr. James H. Hayden* filed a brief for the captors. *Mr. George A. King* and *Mr. William B. King* filed a brief "for certain captors."

MR. JUSTICE GRAY delivered the opinion of the court.

These are two appeals from decrees of the District Court of the United States for the Southern District of Florida, condemning two fishing vessels and their cargoes as prize of war.

Each vessel was a fishing smack, running in and out of Havana, and regularly engaged in fishing on the coast of Cuba; sailed under the Spanish flag; was owned by a Spanish subject of Cuban birth, living in the city of Havana; was commanded by a subject of Spain, also residing in Havana; and her master and crew had no interest in the vessel, but were entitled to shares, amounting in all to two thirds, of her catch, the other third belonging to her owner. Her cargo consisted of fresh fish, caught by her crew from the sea, put on board as they were caught, and kept and sold alive. Until stopped by the blockading squadron, she had no knowledge of the existence of the war, or of any blockade. She had no arms or ammunition on board, and made no attempt to run the blockade after she knew of its existence, nor any resistance at the time of the capture.

The Paquete Habana was a sloop, 43 feet long on the keel,

and of 25 tons burden, and had a crew of three Cubans, including the master, who had a fishing license from the Spanish Government, and no other commission or license. She left Havana March 25, 1898; sailed along the coast of Cuba to Cape San Antonio at the western end of the island, and there fished for twenty-five days, lying between the reefs off the cape, within the territorial waters of Spain; and then started back for Havana, with a cargo of about 40 quintals of live fish. On April 25, 1898, about two miles off Mariel, and eleven miles from Havana, she was captured by the United States gunboat Castine.

The Lola was a schooner, 51 feet long on the keel, and of 35 tons burden, and had a crew of six Cubans, including the master, and no commission or license. She left Havana April 11, 1898, and proceeded to Campeachy Sound off Yucatan, fished there eight days, and started back for Havana with a cargo of about 10,000 pounds of live fish. On April 26, 1898, near Havana, she was stopped by the United States steamship Cincinnati, and was warned not to go into Havana, but was told that she would be allowed to land at Bahia Honda. She then changed her course, and put for Bahia Honda, but on the next morning, when near that port, was captured by the United States steamship Dolphin.

Both the fishing vessels were brought by their captors into Key West. A libel for the condemnation of each vessel and her cargo as prize of war was there filed on April 27, 1898; a claim was interposed by her master, on behalf of himself and the other members of the crew, and of her owner; evidence was taken, showing the facts above stated; and on May 30, 1898, a final decree of condemnation and sale was entered, "the court not being satisfied that as a matter of law, without any ordinance, treaty or proclamation, fishing vessels of this class are exempt from seizure."

Each vessel was thereupon sold by auction; the Paquete Habana for the sum of $490; and the Lola for the sum of $800. There was no other evidence in the record of the value of either vessel or of her cargo.

It has been suggested, in behalf of the United States, that

this court has no jurisdiction to hear and determine these appeals, because the matter in dispute in either case does not exceed the sum or value of $2000, and the District Judge has not certified that the adjudication involves a question of general importance.

The suggestion is founded on section 695 of the Revised Statutes, which provides that " an appeal shall be allowed to the Supreme Court from all final decrees of any District Court in prize causes where the matter in dispute, exclusive of costs, exceeds the sum or value of two thousand dollars; and shall be allowed, without reference to the matter in dispute, on the certificate of the District Judge that the adjudication involves a question of general importance."

The Judiciary Acts of the United States, for a century after the organization of the Government under the Constitution, did impose pecuniary limits upon appellate jurisdiction.

In actions at law and suits in equity, the pecuniary limit of the appellate jurisdiction of this court from the Circuit Courts of the United States was for a long time fixed at $2000. Acts of September 24, 1789, c. 20, § 22; 1 Stat. 84; March 3, 1803, c. 40; 2 Stat. 244; *Gordon* v. *Ogden*, 3 Pet. 33; Rev. Stat. §§ 691, 692. In 1875 'it was raised to $5000. Act of February 16, 1875, c. 77, § 3; 18 Stat. 316. And in 1889 this was modified by providing that, where the judgment or decree did not exceed the sum of $5000, this court should have appellate jurisdiction upon the question of the jurisdiction of the Circuit Court, and upon that question only. Act of February 25, 1889, c. 236, § 1; 25 Stat. 693; *Parker* v. *Ormsby*, 141 U. S. 81.

As to cases of admiralty and maritime jurisdiction, including prize causes, the Judiciary Act of 1789, in § 9, vested the original jurisdiction in the District Courts, without regard to the sum or value in controversy; and in § 21, permitted an appeal from them to the Circuit Court where the matter in dispute exceeded the sum or value of $300. 1 Stat. 77, 83; *The Betsey*, 3 Dall. 6, 16; *The Amiable Nancy*, 3 Wheat. 546; *Stratton* v. *Jarvis*, 8 Pet. 4, 11. By the act of March 3, 1803, c. 40, appeals to the Circuit Court were permitted from all final decrees of a District Court where

the matter in dispute exceeded the sum or value of $50; and from the Circuit Courts to this court in all cases "of admiralty and maritime jurisdiction, and of prize or no prize," in which the matter in dispute exceeded the sum or value of $2000. 2 Stat. 244; *Jenks* v. *Lewis*, 3 Mason, 503; *Stratton* v. *Jarvis*, above cited; *The Admiral*, 3 Wall. 603, 612. The acts of March 3, 1863, c. 86, § 7, and June 30, 1864, c. 174, § 13, provided that appeals from the District Courts in prize causes should lie directly to this court, where the amount in controversy exceeded $2000, " or on the certificate of the District Judge that the adjudication involves a question of general importance." 12 Stat. 760; 13 Stat. 310. The provision of the act of 1803, omitting the words, "and of prize or no prize," was reënacted in section 692 of the Revised Statutes; and the provision of the act of 1864, concerning prize causes, was substantially reënacted in section 695 of the Revised Statutes, already quoted.

But all this has been changed by the act of March 3, 1891, c. 517, establishing the Circuit Courts of Appeals, and creating a new and complete scheme of appellate jurisdiction, depending upon the nature of the different cases, rather than upon the pecuniary amount involved. 26 Stat. 826.

By that act, as this court has declared, the entire appellate jurisdiction from the Circuit and District Courts of the United States was distributed, "according to the scheme of the act," between this court and the Circuit Courts of Appeals thereby established, "by designating the classes of cases" of which each of these courts was to have final jurisdiction. *McLish* v. *Roff*, 141 U. S. 661, 666; *American Construction Co.* v. *Jacksonville Railway*, 148 U. S. 372, 382; *Carey* v. *Houston & Texas Railway*, 150 U. S. 170, 179.

The intention of Congress, by the act of 1891, to make the nature of the case, and not the amount in dispute, the test of the appellate jurisdiction of this court from the District and Circuit Courts clearly appears upon examination of the leading provisions of the act.

Section 4 provides that no appeal, whether by writ of error or otherwise, shall hereafter be taken from a District Court

to a Circuit Court; but that all appeals, by writ of error or otherwise, from the District Courts, "shall only be subject to review" in this court, or in the Circuit Court of Appeals, "as is hereinafter provided," and "the review, by appeal, by writ of error, or otherwise," from the Circuit Courts, "shall be had only" in this court, or in the Circuit Court of Appeals, "according to the provisions of this act regulating the same."

Section 5 provides that "appeals or writs of error may be taken from the District Courts, or from the existing Circuit Courts, direct to the Supreme Court, in the following cases:"

First. "In any case in which the jurisdiction of the court is in issue; in such cases the question of jurisdiction alone shall be certified to the Supreme Court from the court below for decision." This clause includes "any case," without regard to amount, in which the jurisdiction of the court below is in issue; and differs in this respect from the act of 1889, above cited.

Second. "From the final sentences and decrees in prize causes." This clause includes the whole class of "the final sentences and decrees in prize causes," and omits all provisions of former acts regarding amount in controversy, or certificate of a District Judge.

Third. "In cases of conviction of a capital or otherwise infamous crime." This clause looks to the nature of the crime, and not to the extent of the punishment actually imposed. A crime which might have been punished by imprisonment in a penitentiary is an infamous crime, even if the sentence actually pronounced is of a small fine only. *Ex parte Wilson*, 114 U. S. 417, 426. Consequently, such a sentence for such a crime was subject to the appellate jurisdiction of this court, under this clause, until this jurisdiction, so far as regards crimes not capital, was transferred to the Circuit Court of Appeals by the act of January 20, 1897, c. 68. 29 Stat. 492.

Fourth. "In any case that involves the construction or application of the Constitution of the United States."

Fifth. "In any case in which the constitutionality of any law of the United States, or the validity or construction of any treaty made under its authority, is drawn in question."

Sixth. " In any case in which the constitution or law of a State is claimed to be in contravention of the Constitution of the United States."

Each of these last three clauses, again, includes " any case " of the class mentioned. They all relate to what are commonly called Federal questions, and cannot reasonably be construed to have intended that the appellate jurisdiction of this court over such questions should be restricted by any pecuniary limit — especially in their connection with the succeeding sentence of the same section : " Nothing in this act shall affect the jurisdiction of the Supreme Court in cases appealed from the highest court of a State, nor the construction of the statute providing for review of such cases." Writs of error from this court to review the judgments of the highest court of a State upon such questions have never been subject to any pecuniary limit. Act of September 24, 1789, c. 20, § 25 ; 1 Stat. 85 ; *Buel* v. *Van Ness*, 8 Wheat. 312 ; act of February 5, 1867, c. 28, § 2 ; 14 Stat. 386 ; Rev. Stat. § 709.

By section 6 of the act of 1891, this court is relieved of much of the appellate jurisdiction that it had before ; the appellate jurisdiction from the District and Circuit Courts " in all cases other than those provided for in the preceding section of this act, unless otherwise provided by law," is vested in the Circuit Court of Appeals ; and its decisions in admiralty cases, as well as in cases arising under the criminal laws, and in certain other classes of cases, are made final, except that that court may certify to this court questions of law, and that this court may order up the whole case by writ of certiorari. It is settled that the words " unless otherwise provided by law," in this section, refer only to provisions of the same act, or of contemporaneous or subsequent acts, and do not include provisions of earlier statutes. *Lau Ow Bew* v. *United States*, 144 U. S. 47, 57 ; *Hubbard* v. *Soby*, 146 U. S. 56 ; *American Construction Co.* v. *Jacksonville Railway*, 148 U. S. 372, 383.

The act of 1891 nowhere imposes a pecuniary limit upon the appellate jurisdiction, either of this court or of the Circuit Court of Appeals, from a District or Circuit Court of the United States. The only pecuniary limit imposed is one of

$1000 upon the appeal to this court of a case which has been once decided on appeal in the Circuit Court of Appeals, and in which the judgment of that court is not made final by section 6 of the act.

Section 14 of the act of 1891, after specifically repealing section 691 of the Revised Statutes and section 3 of the act of February 16, 1875, further provides that "all acts and parts of acts relating to appeals or writs of error, inconsistent with the provisions for review by appeals or writs of error in the preceding sections five and six of this act, are hereby repealed." 26 Stat. 829, 830. The object of the specific repeal, as this court has declared, was to get rid of the pecuniary limit in the acts referred to. *McLish* v. *Roff*, 141 U. S. 661, 667. And, although neither section 692 nor section 695 of the Revised Statutes is repealed by name, yet, taking into consideration the general repealing clause, together with the affirmative provisions of the act, the case comes within the reason of the decision in an analogous case, in which this court said: "The provisions relating to the subject-matter under consideration are, however, so comprehensive, as well as so variant from those of former acts, that we think the intention to substitute the one for the other is necessarily to be inferred and must prevail." *Fisk* v. *Henarie*, 142 U. S. 459, 468.

The decision of this court in the recent case of *United States* v. *Rider*, 163 U. S. 132, affords an important, if not controlling precedent. From the beginning of this century until the passage of the act of 1891, both in civil and in criminal cases, questions of law, upon which two judges of the Circuit Court were divided in opinion, might be certified by them to this court for decision. Acts of: April 29, 1802, c. 31, § 6; 2 Stat. 159; June 1, 1872, c. 255, § 1; 17 Stat. 196; Rev. Stat. §§ 650–652, 693, 697; *Insurance Co.* v. *Dunham*, 11 Wall. 1, 21; *United States* v. *Sanges*, 144 U. S. 310, 320. But in *United States* v. *Rider*, it was adjudged by this court that the act of 1891 had superseded and repealed the earlier acts authorizing questions of law to be certified from the Circuit Court to this court; and the grounds of that adjudication sufficiently appear by

the statement of the effect of the act of 1891 in two passages of the opinion : " Appellate jurisdiction was given in all criminal cases by writ of error, either from this court or from the Circuit Courts of Appeals, and in all civil cases by appeal or error, without regard to the amount in controversy, except as to appeals or writs of error to or from the Circuit Courts of Appeals in cases not made final, as specified in § 6." " It is true that repeals by implication are not favored, but we cannot escape the conclusion that, tested by its scope, its obvious purpose and its terms, the act of March 3, 1891, covers the whole subject-matter under consideration, and furnishes the exclusive rule in respect of appellate jurisdiction on appeal, writ of error or certificate." 163 U. S. 138–140.

That judgment was thus rested upon two successive propositions : First, that the act of 1891 gives appellate jurisdiction, either to this court or to the Circuit Court of Appeals, in all criminal cases, and in all civil cases " without regard to the amount in controversy." Second, that the act, by its terms, its scope and its obvious purpose, " furnishes the exclusive rule in respect of appellate jurisdiction on appeal, writ of error or certificate."

As was long ago said by Chief Justice Marshall, " the spirit as well as the letter of a statute must be respected, and where the whole context of the law demonstrates a particular intent in the legislature to effect a certain object, some degree of implication may be called in to aid that intent." *Durousseau* v. *United States*, 6 Cranch, 307, 314. And it is a well settled rule in the construction of statutes, often affirmed and applied by this court, that, " even where two acts are not in express terms repugnant, yet if the latter act covers the whole subject of the first, and embraces new provisions, plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act." *United States* v. *Tynen*, 11 Wall. 88, 92; *King* v. *Cornell*, 106 U. S. 395, 396; *Tracy* v. *Tuffly*, 134 U. S. 206, 223; *Fisk* v. *Henarie*, 142 U. S. 459, 468; *District of Columbia* v. *Hutton*, 143 U. S. 18, 27; *United States* v. *Healey*, 160 U. S. 136, 147.

We are of opinion that the act of 1891, upon its face, read

in the light of settled rules of statutory construction, and of the decisions of this court, clearly manifests the intention of Congress to cover the whole subject of the appellate jurisdiction from the District and Circuit Courts of the United States, so far as regards in what cases, as well as to what courts, appeals may be taken, and to supersede and repeal, to this extent, all the provisions of earlier acts of Congress, including those that imposed pecuniary limits upon such jurisdiction; and, as part of the new scheme, to confer upon this court jurisdiction of appeals from all final sentences and decrees in prize causes, without regard to the amount in dispute, and without any certificate of the District Judge as to the importance of the particular case.

We are then brought to the consideration of the question whether, upon the facts appearing in these records, the fishing smacks were subject to capture by the armed vessels of the United States during the recent war with Spain.

By an ancient usage among civilized nations, beginning centuries ago, and gradually ripening into a rule of international law, coast fishing vessels, pursuing their vocation of catching and bringing in fresh fish, have been recognized as exempt, with their cargoes and crews, from capture as prize of war.

This doctrine, however, has been earnestly contested at the bar; and no complete collection of the instances illustrating it is to be found, so far as we are aware, in a single published work, although many are referred to and discussed by the writers on international law, notably in 2 Ortolan, Règles Internationales et Diplomatie de la Mer, (4th ed.) lib. 3, c. 2, pp. 51–56; in 4 Calvo, Droit International, (5th ed.) §§ 2367–2373; in De Boeck, Propriété Privée Ennemie sous Pavillon Ennemi, §§ 191–196; and in Hall, International Law, (4th. ed.) § 148. It is therefore worth the while to trace the history of the rule, from the earliest accessible sources, through the increasing recognition of it, with occasional setbacks, to what we may now justly consider as its final establishment in our own country and generally throughout the civilized world.

The earliest acts of any government on the subject, men-

tioned in the books, either emanated from, or were approved by, a King of England.

In 1403 and 1406, Henry IV issued orders to his admirals and other officers, entitled " Concerning Safety for Fishermen — *De Securitate pro Piscatoribus.*" By an order of October 26, 1403, reciting that it was made pursuant to a treaty between himself and the King of France; and for the greater safety of the fishermen of either country, and so that they could be, and carry on their industry, the more safely on the sea, and deal with each other in peace; and that the French King had consented that English fishermen should be treated likewise; it was ordained that French fishermen might, during the then pending season for the herring fishery; safely fish for herrings and all other fish, from the harbor of Gravelines and the island of Thanet to the mouth of the Seine and the harbor of Hautoune. And by an order of October 5, 1406, he took into his safe conduct, and under his special protection, guardianship and defence, all and singular the fishermen of France, Flanders and Brittany, with their fishing vessels and boats, everywhere on the sea, through and within his dominions, jurisdictions and territories, in regard to their fishery, while sailing, coming and going, and, at their pleasure, freely and lawfully fishing, delaying or proceeding, and returning homeward with their catch of fish, without any molestation or hindrance whatever; and also their fish, nets, and other property and goods soever; and it was therefore ordered that such fishermen should not be interfered with; provided they should comport themselves well and properly, and should not, by color of these presents, do or attempt, or presume to do or attempt, anything that could prejudice the King, or his kingdom of England, or his subjects. 8 Rymer's Foedera, 336, 451.

The treaty made October 2, 1521, between the Emperor Charles V and Francis I of France, through their ambassadors, recited that a great and fierce war had arisen between them, because of which there had been, both by land and by sea, frequent depredations and incursions on either side, to the grave detriment and intolerable injury of the innocent

subjects of each; and that a suitable time for the herring fishery was at hand, and, by reason of the sea being beset by the enemy, the fishermen did not dare to go out, whereby the subject of their industry, bestowed by heaven to allay the hunger of the poor, would wholly fail for the year, unless it were otherwise provided — *quo fit, ut piscaturæ commoditas, ad pauperum levandam famem a cœlesti numine concessa, cessare hoc anno omnino debeat, nisi aliter provideatur.* And it was therefore agreed that the subjects of each sovereign, fishing in the sea, or exercising the calling of fishermen, could and might, until the end of the next January, without incurring any attack, depredation, molestation, trouble or hindrance soever, safely and freely, everywhere in the sea, take herrings and every other kind of fish, the existing war by land and sea notwithstanding; and further that, during the time aforesaid, no subject of either sovereign should commit, or attempt or presume to commit, any depredation, force, violence, molestation or vexation, to or upon such fishermen, or their vessels, supplies, equipments, nets and fish, or other goods soever truly appertaining to fishing. The treaty was made at Calais, then an English possession. It recites that the ambassadors of the two sovereigns met there at the earnest request of Henry VIII, and with his countenance, and in the presence of Cardinal Wolsey, his chancellor and representative. And towards the end of the treaty it is agreed that the said King and his said representative, " by whose means the treaty stands concluded, shall be conservators of the agreements therein, as if thereto by both parties elected and chosen." 4 Dumont, Corps Diplomatique, pt. 1, pp. 352, 353.

The herring fishery was permitted, in time of war, by French and Dutch edicts in 1536. Bynkershoek, Quæstiones Juris Publicæ, lib. 1, c. 3; 1 Emerigon des Assurances, c. 4, sect. 9; c. 12, sect. 19, § 8.

France, from remote times, set the example of alleviating the evils of war in favor of all coast fishermen. In the compilation entitled Us et Coutumes de la Mer, published by Cleirac in 1661, and in the third part thereof, containing " Maritime or Admiralty Jurisdiction — *la Jurisdiction de la*

*Marine ou d'Admirauté* — as well in time of peace as in time of war," article 80 is as follows : " The admiral may in time of war accord fishing truces — *tresves pescheresses* — to the enemy and to his subjects; provided that the enemy will likewise accord them to Frenchmen." Cleirac, 544. Under . this article, reference is made to articles 49 and 79 respectively of the French ordinances concerning the Admiralty in 1543 and 1584, of which it is but a reproduction. 4 Pardessus, Collection de Lois Maritimes, 319; 2 Ortolan, 51. And Cleirac adds, in a note, this quotation from Froissart's Chronicles : " Fishermen on the sea, whatever war there were in France and England, never did harm to one another; so they are friends, and help one another at need — *Pescheurs sur mer, quelque guerre qui soit en France et Angleterre, jamais ne se firent mal l'un à l'autre ; ainçois sont amis, et s'aydent l'un à l'autre au besoin.*"

The same custom would seem to have prevailed in France until towards the end of the seventeenth century. For example, in 1675, Louis XIV and the States General of Holland, by mutual agreement, granted to Dutch and French fishermen the liberty, undisturbed by their vessels of war, of fishing along the coasts of France, Holland and England. D'Hauterive et De Cussy, Traités de Commerce, pt. 1, vol. 2, p. 278. But by the ordinances of 1681 and 1692 the practice was discontinued, because, Valin says, of the faithless conduct of the enemies of France, who, abusing the good faith with which she had always observed the treaties, habitually carried off her fishermen, while their own fished in safety. 2 Valin sur l'Ordonnance de la Marine, (1776) 689, 690; 2 Ortolan, 52; De Boeck, § 192.

The doctrine which exempts coast fishermen with their vessels and cargoes from capture as prize of war has been familiar to the United States from the time of the War of Independence.

On June 5, 1779, Louis XVI, our ally in that war, addressed a letter to his admiral, informing him that the wish he had always had of alleviating, as far as he could, the hardships of war, had directed his attention to that class of his subjects

which devoted itself to the trade of fishing, and had no other means of livelihood; that he had thought that the example which he should give to his enemies, and which could have no other source than the sentiments of humanity which inspired him, would determine them to allow to fishermen the same facilities which he should consent to grant; and that he had therefore given orders to the commanders, of all his ships not to disturb English fishermen, nor to arrest their vessels laden with fresh fish, even if not caught by those vessels; provided they had no offensive arms, and were not proved to have made any signals creating a suspicion of intelligence with the enemy; and the admiral was directed to communicate the King's intentions to all officers under his control. By a royal order in council of November 6, 1780, the former orders were confirmed; and the capture and ransom, by a French cruiser, of *The John and Sarah*, an English vessel, coming from Holland, laden with fresh fish, were pronounced to be illegal. 2 Code des Prises, (ed. 1784) 721, 901, 903.

Among the standing orders made by Sir James Marriott, Judge of the English High Court of Admiralty, was one of April 11, 1780, by which it was "ordered, that all causes of prize of fishing boats or vessels taken from the enemy may be consolidated in one monition, and one sentence or interlocutory, if under fifty tons burden, and not more than six in number." Marriott's Formulary, 4. But by the statements of his successor, and of both French and English writers, it appears that England, as well as France, during the American Revolutionary War, abstained from interfering with the coast fisheries. *The Young Jacob and Johanna*, 1 C. Rob. 20; 2 Ortolan, 53; Hall, § 148.

In the treaty of 1785 between the United States and Prussia, article 23, (which was proposed by the American Commissioners, John Adams, Benjamin Franklin and Thomas Jefferson, and is said to have been drawn up by Franklin,) provided that, if war should arise between the contracting parties, "all women and children, scholars of every faculty, cultivators of the earth, artisans, manufacturers and fishermen,

unarmed and inhabiting unfortified towns, villages or places, and in general all others whose occupations are for the common subsistence and benefit of mankind, shall be allowed to continue their respective employments, and shall not be molested in their persons; nor shall their houses or goods be burnt or otherwise destroyed, nor their fields wasted, by the armed force of the enemy, into whose power, by the events of war, they may happen to fall; but if anything is necessary to be taken from them for the use of such armed force, the same shall be paid for at a reasonable price." 8 Stat. 96; 1 Kent Com. 91 note; Wheaton's History of the Law of Nations, 306, 308. Here was the clearest exemption from hostile molestation or seizure of the persons, occupations, houses and goods of unarmed fishermen inhabiting unfortified places. The article was repeated in the later treaties between the United States and Prussia of 1799 and 1828. 8 Stat. 174, 384. And Dana, in a note to his edition of Wheaton's International Law, says: "In many treaties and decrees, fishermen catching fish as an article of food are added to the class of persons whose occupation is not to be disturbed in war." Wheaton's International Law, (8th ed.) § 345, note 168.

Since the United States became a nation, the only serious interruptions, so far as we are informed, of the general recognition of the exemption of coast fishing vessels from hostile capture, arose out of the mutual suspicions and recriminations of England and France during the wars of the French Revolution.

In the first years of those wars, England having authorized the capture of French fishermen, a decree of the French National Convention of October 2, 1793, directed the executive power " to protest against this conduct, theretofore without example; to reclaim the fishing boats seized; and, in case of refusal, to resort to reprisals." But in July, 1796, the Committee of Public Safety ordered the release of English fishermen seized under the former decree, " not considering them as prisoners of war." *La Nostra Segnora de la Piedad*, (1801) cited below; 2 De Cussy, Droit Maritime, 164, 165; 1 Massé, Droit Commercial, (2d ed.) 266, 267.

On January 24, 1798, the English Government, by express order, instructed the commanders of its ships to seize French and Dutch fishermen with their boats.    6 Martens, Recueil des Traités, (2d ed.) 505 ; 6 Schoell, Histoire des Traités, 119; 2 Ortolan, 53.    After the promulgation of that order, Lord Stowell (then Sir William Scott) in the High Court of Admiralty of England condemned small Dutch fishing vessels as prize of war.    In one case, the capture was in April, 1798, and the decree was made November 13, 1798. _The Young Jacob and Johanna_, 1 C. Rob. 20.    In another case, the decree was made August 23, 1799.   _The Noydt Gedacht_, 2 C. Rob. 137, note.

For the year 1800, the orders of the English and French governments and the correspondence between them may be found in books already referred to.    6 Martens, 503 – 512 ; 6 Schoell, 118 – 120 ; 2 Ortolan, 53, 54.    The doings for that year may be summed up as follows :·  On March 27, 1800, the French government, unwilling to resort to reprisals, reënacted the orders given by Louis XVI in 1780, above mentioned, prohibiting any seizure by the French ships of English fishermen, unless armed, or proved to have made signals to the enemy. On May 30, 1800, the English government, having received notice of that action of the French government, revoked its order of January 24, 1798.    But, soon afterwards, the English government complained that French fishing boats had been made into fireboats at Flushing, as well as that the French government had impressed, and had sent to Brest, to serve in its flotilla, French fishermen and their boats, even those whom the English had released on condition of their not serving; and on January 21, 1801, summarily revoked its last order, and again put in force its order of January 24, 1798. On February 16, 1801, Napoleon Bonaparte, then First Consul, directed the French commissioner at London to return at once to France, first declaring to the English government that its conduct, " contrary to all the usages of civilized nations, and to the common law which governs them, even in time of war, gave to the existing war a character of rage and bitterness which destroyed even the relations usual in a loyal war," and

" tended only to exasperate the two nations, and to put off the term of peace;" and that the French government, having always made it "a maxim to alleviate. as much as possible the evils of war, could not think, on its part, of rendering wretched fishermen victims of a prolongation of hostilities, and would abstain from all reprisals."

On March 16, 1801, the Addington Ministry, having come into power in England, revoked the orders of its predecessors against the French fishermen; maintaining, however, that " the freedom of fishing was nowise founded upon' an agree-ment, but upon a simple concession;" that "this concession would be always subordinate to the convenience of the moment," and that "it was never extended to the great fishery,.or to commerce in oysters or in fish." And the free-dom of the coast fisheries was again allowed on both sides. 6 Martens, 514; 6 Schoell, 121; 2 Ortolan, 54; Manning, Law of Nations, (Amos ed.) 206.

Lord Stowell's judgment in *The Young Jacob and Johanna,* 1 C. Rob. 20, above cited, was much relied on by the counsel for the United States, and deserves careful consideration.

The vessel there condemned is described in the report as " a small Dutch fishing vessel taken April, 1798, on her return from the Dogger bank to Holland;" and Lord Stowell, in delivering judgment, said: " In former wars, it has not been usual to make captures of these small fishing vessels; but this rule was a rule of comity only, and not of legal decision; it has prevailed from views of mutual accommodation between neighboring countries, and from tenderness to a poor and industrious order of people. In the present war there has, I presume, been sufficient reason for changing this mode of treatment, and, as they are brought before me for my judg-ment, they must be referred to the general principles of this court; they fall under the character and description of the last class of cases; that is, of ships constantly and exclusively employed in the enemy's trade." And he added: " It is a farther satisfaction to me in giving this judgment to observe that the facts also bear strong marks of a false and fraudulent transaction."

Both the capture and condemnation were within a year after the order of the English government of January 24, 1798, instructing the commanders of its ships to seize French and Dutch fishing vessels, and before any revocation of that order. Lord Stowell's judgment shows that his decision was based upon the order of 1798, as well as upon strong evidence of fraud. Nothing more was adjudged in the case.

But some expressions in his opinion have been given so much weight by English writers, that it may be well to examine them particularly. The opinion begins by admitting the known custom in former wars not to capture such vessels — adding, however, "but this was a rule of comity only, and not of legal decision." Assuming the phrase "legal decision" to have been there used, in the sense in which courts are accustomed to use it, as equivalent to "judicial decision," it is true that, so far as appears, there had been no such decision on the point in England. The word "comity" was apparently used by Lord Stowell as synonymous with courtesy or good will. But the period of a hundred years which has since elapsed is amply sufficient to have enabled what originally may have rested in custom or comity, courtesy or concession, to grow, by the general assent of civilized nations, into a settled rule of international law. As well said by Sir James Mackintosh: "In the present century a slow and silent, but very substantial mitigation has taken place in the practice of war; and in proportion as that mitigated practice has received the sanction of time, it is raised from the rank of mere usage, and becomes part of the law of nations." Discourse on the Law of Nations, 38; 1 Miscellaneous Works, 360.

The French prize tribunals, both before and after Lord Stowell's decision, took a wholly different view of the general question. In 1780, as already mentioned, an order in council of Louis XVI had declared illegal the capture by a French cruiser of *The John and Sarah*, an English vessel, coming from Holland, laden with fresh fish. And on May 17, 1801, where a Portuguese fishing vessel, with her cargo of fish, having no more crew than was needed for her management, and for serving the nets, on a trip of several days, had been cap-

tured in April, 1801, by a French cruiser, three leagues off the coast of Portugal, the Council of Prizes held that the capture was contrary to " the principles of humanity, and the maxims of international law," and decreed that the vessel, with the fish on board, or the net proceeds of any that had been sold, should be restored to her master. *La Nostra Segnora de la Piedad*, 25 Merlin, Jurisprudence, Prise Maritime, § 3, art. 1, 3; *S. C.* 1 Pistoye et Duverdy, Prises Maritimes, 331; 2 De Cussy, Droit Maritime, 166.

The English government, soon afterwards, more than once unqualifiedly prohibited the molestation of fishing vessels employed in catching and bringing to market fresh fish. On May 23, 1806, it was " ordered in council, that all fishing vessels under Prussian and other colors, and engaged for the purpose of catching fish and conveying them fresh to market, with their crews, cargoes and stores, shall not be molested on their fishing voyages and bringing the same to market; and that no fishing vessels of this description shall hereafter be molested. And the Right Honorable the Lords Commissioners of His Majesty's Treasury, the Lords Commissioners of the Admiralty and the Judge of the High Court of Admiralty are to give the necessary directions herein as to them may respectively appertain." 5 C. Rob. 408. Again, in the order in council of May 2, 1810, which directed that " all vessels which shall have cleared out from any port so far under the control of France or her allies as that British vessels may not freely trade thereat, and which are employed in the whale fishery, or other fishery of any description, save as hereinafter excepted, and are returning or destined to return either to the port from whence they cleared, or to any other port or place at which the British flag may not freely trade, shall be captured, and condemned together with their stores and cargoes, as prize to the captors," there were excepted " vessels employed in catching and conveying fish fresh to market, such vessels not being fitted or provided for the curing of fish." Edw. Adm. appx. L.

Wheaton, in his Digest of the Law of Maritime Captures and Prizes, published in 1815, wrote: " It has been usual

in maritime wars to exempt from capture fishing boats and their cargoes, both from views of mutual accommodation between neighboring countries, and from tenderness to a poor and industrious order of people. This custom, so honorable to the humanity of civilized nations, has fallen into disuse; and it is remarkable that both France and England mutually reproach each other with that breach of good faith which has finally abolished it." Wheaton on Captures, c. 2, § 18.

This statement clearly exhibits Wheaton's opinion that the custom had been a general one, as well as that it ought to remain so. His assumption that it had been abolished by the differences between France and England at the close of the last century was hardly justified by the state of things when he wrote, and has not since been borne out.

During the wars of the French Empire, as both French and English writers agree, the coast fisheries were left in peace. 2 Ortolan, 54; De Boeck, § 193; Hall, § 148. De Boeck quaintly and truly adds, "and the incidents of 1800 and of 1801 had no morrow — *n'eurent pas de lendemain.*"

In the war with Mexico in 1846, the United States recognized the exemption of coast fishing boats from capture. In proof of this, counsel have referred to records of the Navy Department, which this court is clearly authorized to consult upon such a question. *Jones* v. *United States*, 137 U. S. 202; *Underhill* v. *Hernandez*, 168 U. S. 250, 253.

By those records it appears that Commodore Conner, commanding the Home Squadron blockading the east coast of Mexico, on May 14, 1846, wrote a letter from the ship Cumberland, off Brazos Santiago, near the southern point of Texas, to Mr. Bancroft, the Secretary of the Navy, enclosing a copy of the commodore's "instructions to the commanders of the vessels of the Home Squadron, showing the principles to be observed in the blockade of the Mexican ports," one of which was that " Mexican boats engaged in fishing on any part of the coast will be allowed to pursue their labors unmolested; " and that on June 10, 1846, those instructions were approved by the Navy Department, of which Mr. Bancroft was still the head, and continued to be until he was appointed Minister to

England in September following.   Although Commodore Conner's instructions and the Department's approval thereof do not appear in any contemporary publication of the Government, they evidently became generally known at the time, or soon after; for it is stated in several treatises on international law (beginning with Ortolan's second edition, published in 1853) that the United States in the Mexican War permitted the coast fishermen of the enemy to continue the free exercise of their industry.   2 Ortolan, (2d ed.) 49 note; (4th ed.) 55; 4 Calvo, (5th ed.) § 2372; De Boeck, § 194; Hall, (4th ed.) § 148.

As qualifying the effect of those statements, the counsel for the United States relied on a proclamation of Commodore Stockton, commanding the Pacific Squadron, dated August 20, 1846, directing officers under his command to proceed immediately to blockade the ports of Mazatlan and San Blas on the west coast of Mexico, and saying to them, " All neutral vessels that you may find there you will allow twenty days to depart; and you will make the blockade absolute against all vessels, except armed vessels of neutral nations.   You will capture all vessels under the Mexican flag that you may be able to take." Navy Report of 1846, pp. 673, 674.   But there is nothing to show that Commodore Stockton intended, or that the Government approved, the capture of coast fishing vessels.

On the contrary, General Halleck, in the preface to his work on International Law or Rules Regulating the Intercourse of States in Peace and War, published in 1861, says that he began that work, during the war between the United States and Mexico, " while serving on the staff of the commander of the Pacific Squadron " and " often required to give opinions on questions of international law growing out of the operations of the war."   Had the practice of the blockading squadron on the west coast of Mexico during that war, in regard to fishing vessels, differed from that approved by the Navy Department on the east coast, General Halleck could hardly have failed to mention it, when stating the prevailing doctrine upon the subject as follows :

"Fishing boats have also, as a general rule, been exempted from the effects of hostilities. As early as 1521, while war was raging between Charles V and Francis, ambassadors from these two sovereigns met at Calais, then English, and agreed that, whereas the herring fishery was about to commence, the subjects of both belligerents, engaged in this pursuit, should be safe and unmolested by the other party, and should have leave to fish as in time of peace. In the war of 1800, the British and French governments issued formal instructions exempting the fishing boats of each other's subjects from seizure. This order was subsequently rescinded by the British government, on the alleged ground that some French fishing boats were equipped as gunboats, and that some French fishermen, who had been prisoners in England, had violated their parole not to serve, and had gone to join the French fleet at Brest. Such excuses were evidently mere pretexts, and, after some angry discussions had taken place on the subject, the British restriction was withdrawn, and the freedom of fishing was again allowed on both sides. French writers consider this exemption as an established principle of the modern law of war, and it has been so recognized in the French courts, which have restored such vessels when captured by French cruisers." Halleck, (1st ed.) c. 20, § 23.

That edition was the only one sent out under the author's own auspices, except an abridgment, entitled Elements of International Law and the Law of War, which he published in 1866, as he said in the preface, to supply a suitable text-book for instruction upon the subject, "not only in our colleges, but also in our two great national schools — the Military and Naval Academies." In that abridgment, the statement as to fishing boats was condensed, as follows: "Fishing boats have also, as a general rule, been exempted from the effects of hostilities. French writers consider this exemption as an established principle of the modern law of war, and it has been so recognized in the French courts, which have restored such vessels when captured by French cruisers." Halleck's Elements, c. 20, § 21.

In the treaty of peace between the United States and Mex-

ico in 1848 were inserted the very words of the earlier treaties with Prussia, already quoted, forbidding the hostile molestation or seizure in time of war of the persons, occupations, houses or goods of fishermen. 9 Stat. 939, 940.

Wharton's Digest of the International Law of the United States, published by authority of Congress in 1886 and 1887, embodies General Halleck's fuller statement, above quoted, and contains nothing else upon the subject. 3 Whart. Int. Law Dig. § 345, p. 315; 2 Halleck, (Eng. eds. 1873 and 1878) p. 151.

France, in the Crimean War in 1854, and in her wars with Austria in 1859 and with Germany in 1870, by general orders, forbade her cruisers to trouble the coast fisheries, or to seize any vessel or boat engaged therein, unless naval or military operations should make it necessary. Calvo, § 2372; Hall, § 148; 2 Ortolan, (4th ed.) 449; 10 Revue de Droit International, (1878) 399.

Calvo says that in the Crimean War, "notwithstanding her alliance with France and Italy, England did not follow the same line of conduct, and her cruisers in the Sea of Azof destroyed the fisheries, nets, fishing implements, provisions, boats, and even the cabins, of the inhabitants of the coast." Calvo, § 2372. And a Russian writer on Prize Law remarks that those depredations, "having brought ruin on poor fishermen and inoffensive traders, could not but leave a painful impression on the minds of the population, without impairing in the least the resources of the Russian government." Katchenovsky, (Pratt's ed.) 148. But the contemporaneous reports of the English naval officers put a different face on the matter, by stating that the destruction in question was part of a military measure, conducted with the coöperation of the French ships, and pursuant to instructions of the English admiral "to clear the seaboard of all fish stores, all fisheries and mills, on a scale beyond the wants of the neighboring population, and indeed of all things destined to contribute to the maintenance of the enemy's army in the Crimea;" and that the property destroyed consisted of large fishing establishments and storehouses of the Russian government, numbers of heavy launches, and enormous quantities of nets and gear, salted fish, corn

and other provisions, intended for the supply of the Russian army.   United Service Journal of 1855, pt. 3, pp. 108–112.

Since the English orders in council of 1806 and 1810, before quoted, in favor of fishing vessels employed in catching and bringing to market fresh fish, no instance has been found in which the exemption from capture of private coast fishing vessels, honestly pursuing their peaceful industry, has been denied by England, or by any other nation.   And the Empire of Japan, (the last State admitted into the rank of civilized nations,) by an ordinance promulgated at the beginning of its war with China in August, 1894, established prize courts, and ordained that " the following enemy's vessels are exempt from detention " — including in the exemption " boats engaged in coast fisheries," as well as " ships engaged exclusively on a voyage of scientific discovery, philanthropy or religious mission."   Takahashi, International Law, 11, 178.

International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination.   For this purpose, where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is. *Hilton* v. *Guyot,* 159 U. S. 113, 163, 164, 214, 215.

Wheaton places, among the principal sources of international law, " Text-writers of authority, showing what is the approved usage of nations, or the general opinion respecting their mutual conduct, with the definitions and modifications introduced by general consent."   As to these he forcibly observes : " Without wishing to exaggerate the importance of these writers, or to substitute, in any case, their authority for the principles of reason, it may be affirmed that they are gen-

erally impartial in their judgment. They are witnesses of the sentiments and usages of civilized nations, and the weight of their testimony increases every time that their authority is invoked by statesmen, and every year that passes without the rules laid down in their works being impugned by the avowal of contrary principles." Wheaton's International Law, (8th ed.) § 15.

Chancellor Kent says: " In the absence of higher and more authoritative sanctions, the ordinances of foreign States, the opinions of eminent statesmen, and the writings of distinguished jurists, are regarded as of great consideration on questions not settled by conventional law. In cases where the principal jurists agree, the presumption will be very great in favor of the solidity of their maxims; and no civilized nation, that does not arrogantly set all ordinary law and justice at defiance, will venture to disregard the uniform sense of the established writers on international law." 1 Kent Com. 18.

It will be convenient, in the first place, to refer to some leading French treatises on international law, which deal with the question now before us, not as one of the law of France only, but as one determined by the general consent of civilized nations.

" Enemy ships," say Pistoye and Duverdy, in their Treatise on Maritime Prizes, published in 1855, " are good prize. Not all, however; for it results from the unanimous accord of the maritime powers that an exception should be made in favor of coast fishermen. Such fishermen are respected by the enemy, so long as they devote themselves exclusively to fishing." 1 Pistoye et Duverdy, tit. 6, c. 1, p. 314.

De Cussy, in his work on the Phases and Leading Cases of the Maritime Law of Nations — *Phases et Causes Célèbres du Droit Maritime des Nations* — published in 1856, affirms in the clearest language the exemption from capture of fishing boats, saying, in lib. 1, tit. 3, § 36, that " in time of war the freedom of fishing is respected by belligerents; fishing boats are considered as neutral; in law, as in principle, they are not subject either to capture or to confiscation ; " and that in lib. 2, c. 20, he will state " several facts and several decisions

which prove that the perfect freedom and neutrality of fishing boats are not illusory." 1 De Cussy, p. 291. And in the chapter referred to, entitled *De la Liberté et de la Neutralité Parfaite de la Pêche*, besides references to the edicts and decisions in France during the French Revolution, is this general statement: "If one consulted only positive international law" — *le droit des gens positif* — (by which is evidently meant international law expressed in treaties, decrees or other public acts, as distinguished from what may be implied from custom or usage,) "fishing boats would be subject, like all other trading vessels, to the law of prize; a sort of tacit agreement among all European nations frees them from it, and several official declarations have confirmed this privilege in favor of 'a class of men whose hard and ill rewarded labor, commonly performed by feeble and aged hands, is so foreign to the operations of war.'" 2 De Cussy, 164, 165.

Ortolan, in the fourth edition of his *Règles Internationales et Diplomatie de la Mer*, published in 1864, after stating the general rule that the vessels and cargoes of subjects of the enemy are lawful prize, says: "Nevertheless, custom admits an exception in favor of boats engaged in the coast fishery; these boats, as well as their crews, are free from capture and exempt from all hostilities. The coast fishing industry is, in truth, wholly pacific, and of much less importance, in regard to the national wealth that it may produce, than maritime commerce or the great fisheries. Peaceful and wholly inoffensive, those who carry it on, among whom women are often seen, may be called the harvesters of the territorial seas, since they confine themselves to gathering in the products thereof; they are for the most part poor families who seek in this calling hardly more than the means of gaining their livelihood." 2 Ortolan, 51. Again, after observing that there are very few solemn public treaties which make mention of the immunity of fishing boats in time of war, he says: "From another point of view, the custom which sanctions this immunity is not so general that it can be considered as making an absolute international rule; but it has been so often put in practice, and, besides, it accords so well with the rule in use, in wars on

land, in regard to peasants and husbandmen, to whom coast fishermen may be likened, that it will doubtless continue to be followed in maritime wars to come." 2 Ortolan, 55.

No international jurist of the present day has a wider or more deserved reputation than Calvo, who, though writing in French, is a citizen of the Argentine Republic, employed in its diplomatic service abroad. In the fifth edition of his great work on international law, published in 1896, he observes, in § 2366, that the international authority of decisions in particular cases by the prize courts of France, of England, and of the United States, is lessened by the fact that the principles on which they are based are largely derived from the internal legislation of each country ; and yet the peculiar character of maritime wars, with other considerations, gives to prize jurisprudence a force and importance reaching beyond the limits of the country in which it has prevailed. He therefore proposes here to group together a number of particular cases proper to serve as precedents for the solution of grave questions of maritime law in regard to the capture of private property as prize of war. Immediately, in § 2367, he goes on to say : "Notwithstanding the hardships to which maritime wars subject private property, notwithstanding the extent of the recognized rights of belligerents, there are generally exempted, from seizure and capture, fishing vessels." In the next section he adds : "This exception is perfectly justiciable — *Cette exception est parfaitement justiciable*" — that is to say, belonging to judicial jurisdiction or cognizance. Littré, Dict. *voc.* Justiciable ; *Hans* v. *Louisiana*, 134 U. S. 1, 15. Calvo then quotes Ortolan's description, above cited, of the nature of the coast fishing industry; and proceeds to refer, in detail, to some of the French precedents, to the acts of the French and English governments in the times of Louis XVI and of the French Revolution, to the position of the United States in the war with Mexico, and of France in later wars, and to the action of British cruisers in the Crimean War. And he concludes his discussion of the subject, in § 2373, by affirming the exemption of the coast fishery, and pointing out the distinction in this regard between the coast fishery and

what he calls the great fishery, for cod, whales or seals, as follows: "The privilege of exemption from capture, which is generally acquired by fishing vessels plying their industry near the coasts, is not extended in any country to ships employed on the high sea in what is called the great fishery, such as that for the cod, for the whale or the sperm whale, or for the seal or sea calf. These ships are, in effect, considered as devoted to operations which are at once commercial and industrial — *Ces navires sont en effet considérés comme adonnés à des opérations à la fois commerciales et industrielles.*" The distinction is generally recognized. 2 Ortolan, 54; De Boeck, § 196; Hall, § 148. See also *The Susa*, 2 C. Rob. 251; *The Johan*, Edw. Adm. 275, and appx. L.

The modern German books on international law, cited by the counsel for the appellants, treat the custom, by which the vessels and implements of coast fishermen are exempt from seizure and capture, as well established by the practice of nations. Heffter, § 137; 2 Kaltenborn, § 237, p. 480; Bluntschli, § 667; Perels, § 37, p. 217.

De Boeck, in his work on Enemy Private Property under Enemy Flag — *de la Propriété Privée Ennemie sous Pavillon Ennemi* — published in 1882, and the only continental treatise cited by the counsel for the United States, says in § 191: ".A usage very ancient, if not universal, withdraws from the right of capture enemy vessels engaged in the coast fishery. The reason of this exception is evident; it would have been too hard to snatch from poor fishermen the means of earning their bread." "The exemption includes the boats, the fishing implements and the cargo of fish." Again, in § 195: "It is to be observed that very few treaties sanction in due form this immunity of the coast fishery." "There is, then, only a custom. But what is its character? Is it so fixed and general that it can be raised to the rank of a positive and formal rule of international law?" After discussing the statements of other writers, he approves the opinion of Ortolan (as expressed in the last sentence above quoted from his work) and says that, at bottom, it differs by a shade only from that formulated by Calvo and by some of the German jurists, and that "it is more exact,

without ignoring the imperative character of the humane rule in question — *elle est plus exacte, sans méconnaître le caractère impératif de la règle d'humanité dont il s'agit.*" And, in § 196, he defines the limits of the rule as follows: "But the immunity of the coast fishery must be limited by the reasons that justify it. The reasons of humanity and of harmlessness — *les raisons d'humanité et d'innocuité* — which militate in its favor do not exist in the great fishery, such as the cod fishery; ships engaged in that fishery devote themselves to truly commercial operations, which employ a large number of seamen. And these same reasons cease to be applicable to fishing vessels employed for a warlike purpose, to those which conceal arms, or which exchange signals of intelligence with ships of war; but only those taken in the fact can be rigorously treated; to allow seizure by way of prevention would open the door to every abuse, and would be equivalent to a suppression of the immunity."

Two recent English text-writers, cited at the bar, (influenced by what Lord Stowell said a century since,) hesitate to recognize that the exemption of coast fishing vessels from capture has now become a settled rule of international law. Yet they both admit that there is little real difference in the views, or in the practice, of England and of other maritime nations; and that no civilized nation at the present day would molest coast fishing vessels, so long as they were peaceably pursuing their calling, and there was no danger that they or their crews might be of military use to the enemy. Hall, in § 148 of the fourth edition of his Treatise on International Law, after briefly sketching the history of the positions occupied by France and England at different periods, and by the United States in the Mexican War, goes on to say: "In the foregoing facts there is nothing to show that much real difference has existed in the practice of the maritime countries. England does not seem to have been unwilling to spare fishing vessels so long as they are harmless, and it does not appear that any State has accorded them immunity under circumstances of inconvenience to itself. It is likely that all nations would now refrain from molesting them as a general rule, and would cap-

ture them so soon as any danger arose that they or their crews might be of military use to the enemy; and it is also likely that it is impossible to grant them a more distinct exemption." So T. J. Lawrence, in § 206 of his Principles of International Law, says: " The difference between the English and the French view is more apparent than real; for no civilized belligerent would now capture the boats of fishermen plying their avocation peaceably in the territorial waters of their own State; and no jurist would seriously argue that their immunity must be respected if they were used for warlike purposes, as were the smacks belonging to the northern ports of France when Great Britain gave the order to capture them in 1800."

But there are writers of various maritime countries, not yet cited, too important to be passed by without notice.

Jan Helenus Ferguson, Netherlands Minister to China, and previously in the naval and in the colonial service of his country, in his Manual of International Law for the Use of Navies, Colonies and Consulates, published in 1882, writes: " An exception to the usage of capturing enemy's private vessels at sea is the coast fishery." "This principle of immunity from capture of fishing boats is generally adopted by all maritime powers, and in actual warfare they are universally spared so long as they remain harmless." 2 Ferguson, § 212.

Ferdinand Attlmayr, Captain in the Austrian Navy, in his Manual for Naval Officers, published at Vienna in 1872 under the auspices of Admiral Tegetthoff, says: " Regarding the capture of enemy property, an exception must be mentioned, which is a universal custom. Fishing vessels which belong to the adjacent coast, and whose business yields only a necessary livelihood, are, from considerations of humanity, universally excluded from capture." 1 Attlmayr, 61.

Ignacio de Negrin, First Official of the Spanish Board of Admiralty, in his Elementary Treatise on Maritime International Law, adopted by royal order as a text-book in the Naval Schools of Spain, and published at Madrid in 1873, concludes his chapter " Of the lawfulness of prizes " with these words: " It remains to be added that the custom of all civilized peoples excludes from capture, and from all kind of hostility, the

fishing vessels of the enemy's coasts, considering this industry as absolutely inoffensive, and deserving, from its hardships and usefulness, of this favorable exception. It has been thus expressed in very many international conventions, so that it can be deemed an incontestable principle of law, at least among enlightened nations." Negrin, tit. 3, c. 1, § 310.

Carlos Testa, Captain in the Portuguese Navy and Professor in the Naval School at Lisbon, in his work on Public International Law, published in French at Paris in 1886, when discussing the general right of capturing enemy ships, says : " Nevertheless, in this, customary law establishes an exception of immunity in favor of coast fishing vessels. Fishing is so peaceful an industry, and is generally carried on by so poor and so hardworking a class of men, that it is likened, in the territorial waters of the enemy's country, to the class of husbandmen who gather the fruits of the earth for their livelihood. The examples and practice generally followed establish this humane and beneficent exception as an international rule, and this rule may be considered as adopted by customary law and by all civilized nations." Testa, pt. 3, c. 2, in 18 Bibliothèque International et Diplomatique, pp. 152, 153.

No less clearly and decisively speaks the distinguished Italian jurist, Pasquale Fiore, in the enlarged edition of his exhaustive work on Public International Law, published at Paris in 1885-6, saying : " The vessels of fishermen have been generally declared exempt from confiscation, because of the eminently peaceful object of their humble industry, and of the principles of equity and humanity. The exemption includes the vessel, the implements of fishing, and the cargo resulting from the fishery. This usage, eminently humane, goes back to very ancient times; and although the immunity of fishery along the coasts may not have been sanctioned by treaties, yet it is considered to-day as so definitely established, that the inviolability of vessels devoted to that fishery is proclaimed by the publicists as a positive rule of international law, and is generally respected by the nations. Consequently, we shall lay down the following rule: (a) Vessels belonging to citizens of the enemy State, and devoted to fish-

ing along the coasts, cannot be subject to capture. (*b*) Such vessels, however, will lose all right of exemption, when employed for a warlike purpose. (*c*) There may, nevertheless, be subjected to capture vessels devoted to the great fishery in the ocean, such as those employed in the whale fishery, or in that for seals or sea calves." 3 Fiore, § 1421.

This review of the precedents and authorities on the subject appears to us abundantly to demonstrate that at the present day, by the general consent of the civilized nations of the world, and independently of any express treaty or other public act, it is an established rule of international law, founded on considerations of humanity to a poor and industrious order of men, and of the mutual convenience of belligerent States, that coast fishing vessels, with their implements and supplies, cargoes and crews, unarmed, and honestly pursuing their peaceful calling of catching and bringing in fresh fish, are exempt from capture as prize of war.

The exemption, of course, does not apply to coast fishermen or their vessels, if employed for a warlike purpose, or in such a way as to give aid or information to the enemy; nor when military or naval operations create a necessity to which all private interests must give way.

Nor has the exemption been extended to ships or vessels employed on the high sea in taking whales or seals, or cod or other fish which are not brought fresh to market, but are salted or otherwise cured and made a regular article of commerce.

This rule of international law is one which prize courts, administering the law of nations, are bound to take judicial notice of, and to give effect to, in the absence of any treaty or other public act of their own government in relation to the matter.

Calvo, in a passage already quoted, distinctly affirms that the exemption of coast fishing vessels from capture is perfectly justiciable, or, in other words, of judicial jurisdiction or cognizance. Calvo, § 2368. Nor are judicial precedents wanting in support of the view that this exemption, or a somewhat analogous one, should be recognized and declared by a prize court.

By the practice of all civilized nations, vessels employed
only for the purposes of discovery or science are considered as
exempt from the contingencies of war, and therefore not sub-
ject to capture.   It has been usual for the government send-
ing out such an expedition to give notice to other powers; but
it is not essential.   1 Kent Com. 91, note; Halleck, c. 20, § 22;
Calvo, § 2376; Hall, § 138.

In 1813, while the United States were at war with England,
an American vessel, on her voyage from Italy to the United
States, was captured by an English ship, and brought into
Halifax in Nova Scotia, and, with her cargo, condemned as
lawful prize by the Court of Vice Admiralty there.   But a
petition for the restitution of a case of paintings and engrav-
ings, which had been presented to and were owned by the
Academy of Arts in Philadelphia, was granted by Dr. Croke,
the judge of that court, who said : "The same law of nations,
which prescribes that all property belonging to the enemy
shall be liable to confiscation, has likewise its modifications
and relaxations of that rule.   The arts and sciences are ad-
mitted, amongst all civilized nations, as forming an exception
to the severe rights of warfare, and as entitled to favor and
protection.   They are considered not as the peculium of this
or of that nation, but as the property of mankind at large, and
as belonging to the common interests of the whole species."
And he added that there had been "innumerable cases of the
mutual exercise of this courtesy between nations in former
wars."   *The Marquis de Somerueles*, Stewart Adm. (Nova
Scotia) 445, 482.

In 1861, during the War of the Rebellion, a similar decision
was made, in the District Court of the United States for the
Eastern District of Pennsylvania, in regard to two cases of
books belonging and consigned to a university in North Caro-
lina.   Judge Cadwalader, in ordering these books to be liber-
ated from the custody of the marshal, and restored to the
agent of the university, said : "Though this claimant, as the
resident of a hostile district, would not be entitled to restitu-
tion of the subject of a commercial adventure in books, the
purpose of the shipment in question gives to it a different

character. The United States, in prosecuting hostilities for the restoration of their constitutional authority, are compelled incidentally to confiscate property captured at sea, of which the proceeds would otherwise increase the wealth of that district. But the United States are not at war with literature in that part of their territory." He then referred to the decision in Nova Scotia, and to the French decisions upon cases of fishing vessels, as precedents for the decree which he was about to pronounce; and he added that, without any such precedents, he should have had no difficulty in liberating these books. *The Amelia,* 4 Philadelphia, 417.

In *Brown* v. *United States,* 8 Cranch, 110, there are expressions of Chief Justice Marshall which, taken by themselves, might seem inconsistent with the position above maintained of the duty of a prize court to take judicial notice of a rule of international law, established by the general usage of civilized nations, as to the kind of property subject to capture. But the actual decision in that case, and the leading reasons on which it was based, appear to us rather to confirm our position. The principal question there was whether personal property of a British subject, found on land in the United States at the beginning of the last war with Great Britain, could lawfully be condemned as enemy's property, on a libel filed by the attorney of the United States, without a positive act of Congress. The conclusion of the court was "that the power of confiscating enemy property is in the legislature, and that the legislature has not yet declared its will to confiscate property which was within our territory at the declaration of war." 8 Cranch, 129. In showing that the declaration of war did not, of itself, vest the executive with authority to order such property to be confiscated, the Chief Justice relied on the modern usages of nations, saying: "The universal practice of forbearing to seize and confiscate debts and credits, the principle universally received that the right to them revives on the restoration of peace, would seem to prove that war is not an absolute confiscation of this property, but simply confers the right of confiscation;" and again: "The modern rule then would seem to be that tangible property

belonging to an enemy, and found in the country at the commencement of war, ought not to be immediately confiscated; and in almost every commercial treaty an article is inserted stipulating for the right to withdraw such property." 8 Cranch, 123, 125. The decision that enemy property on land, which by the modern usage of nations is not subject to capture as prize of war, cannot be condemned by a prize court, even by direction of the executive, without express authority from Congress, appears to us to repel any inference that coast fishing vessels, which are exempt by the general consent of civilized nations from capture, and which no act of Congress or order of the President has expressly authorized to be taken and confiscated, must be condemned by a prize court, for want of a distinct exemption in a treaty or other public act of the Government.

To this subject, in more than one aspect, are singularly applicable the words uttered by Mr. Justice Strong, speaking for this court: "Undoubtedly, no single nation can change the law of the sea. That law is of universal obligation, and no statute of one or two nations can create obligations for the world. Like all the laws of nations, it rests upon the common consent of civilized communities. It is of force, not because it was prescribed by any superior power, but because it has been generally accepted as a rule of conduct. Whatever may have been its origin, whether in the usages of navigation, or in the ordinances of maritime States, or in both, it has become the law of the sea only by the concurrent sanction of those nations who may be said to constitute the commercial world. Many of the usages which prevail, and which have the force of law, doubtless originated in the positive prescriptions of some single State, which were at first of limited effect, but which, when generally accepted, became of universal obligation." "This is not giving to the statutes of any nation extra-territorial effect. It is not treating them as general maritime laws; but it is recognition of the historical fact that by common consent of mankind these rules have been acquiesced in as of general obligation. Of that fact, we think, we may take judicial notice. Foreign municipal laws

must indeed be proved as facts, but it is not so with the law of nations." *The Scotia*, 14 Wall. 170, 187, 188.

The position taken by the United States during the recent war with Spain was quite in accord with the rule of international law, now generally recognized by civilized nations, in regard to coast fishing vessels.

On April 21, 1898, the Secretary of the Navy gave instructions to Admiral Sampson, commanding the North Atlantic Squadron, to "immediately institute a blockade of the north coast of Cuba, extending from Cardenas on the east to Bahia Honda on the west." Bureau of Navigation Report of 1898, appx. 175. The blockade was immediately instituted accordingly. On April 22, the President issued a proclamation, declaring that the United States had instituted and would maintain that blockade, "in pursuance of the laws of the United States, and the law of nations applicable to such cases." 30 Stat. 1769. And by the act of Congress of April 25, 1898, c. 189, it was declared that the war between the United States and Spain existed on that day, and had existed since and including April 21. 30 Stat. 364.

On April 26, 1898, the President issued another proclamation, which, after reciting the existence of the war, as declared by Congress, contained this further recital: "It being desirable that such war should be conducted upon principles in harmony with the present views of nations and sanctioned by their recent practice." This recital was followed by specific declarations of certain rules for the conduct of the war by sea, making no mention of fishing vessels. 30 Stat. 1770. But the proclamation clearly manifests the general policy of the Government to conduct the war in accordance with the principles of international law sanctioned by the recent practice of nations.

On April 28, 1898, (after the capture of the two fishing vessels now in question,) Admiral Sampson telegraphed to the Secretary of the Navy as follows: "I find that a large number of fishing schooners are attempting to get into Havana from their fishing grounds near the Florida reefs and coasts. They are generally manned by excellent seamen, belonging

to the maritime inscription of Spain, who have already served in the Spanish navy, and who are liable to further service. As these trained men are naval reserves, have a semi-military character, and would be most valuable to the Spaniards as artillerymen, either afloat or ashore, I recommend that they should be detained prisoners of war, and that I should be authorized to deliver them to the commanding officer of the army at Key West." To that communication the Secretary of the Navy, on April 30, 1898, guardedly answered: "Spanish fishing vessels attempting to violate blockade are subject, with crew, to capture, and any such vessel or crew considered likely to aid enemy may be detained." Bureau of Navigation Report of 1898, appx. 178. The Admiral's despatch assumed that he was not authorized, without express order, to arrest coast fishermen peaceably pursuing their calling; and the necessary implication and evident intent of the response of the Navy Department were that Spanish coast fishing vessels and their crews should not be interfered with, so long as they neither attempted to violate the blockade, nor were considered likely to aid the enemy.

The Paquete Habana, as the record shows, was a fishing sloop of 25 tons burden, sailing under the Spanish flag, running in and out of Havana, and regularly engaged in fishing on the coast of Cuba. Her crew consisted of but three men, including the master; and, according to a common usage in coast fisheries, had no interest in the vessel, but were entitled to two thirds of her catch, the other third belonging to her Spanish owner, who, as well as the crew, resided in Havana. On her last voyage, she sailed from Havana along the coast of Cuba, about two hundred miles, and fished for twenty-five days off the cape at the west end of the island, within the territorial waters of Spain; and was going back to Havana, with her cargo of live fish, when she was captured by one of the blockading squadron, on April 25, 1898. She had no arms or ammunition on board; she had no knowledge of the blockade, or even of the war, until she was stopped by a blockading vessel; she made no attempt to run the blockade, and no resistance at the time of the capture; nor was there any evi-

dence whatever of likelihood that she or her crew would aid the enemy.

In the case of the Lola, the only differences in the facts were that she was a schooner of 35 tons burden, and had a crew of six men, including the master; that after leaving Havana, and proceeding some two hundred miles along the coast of Cuba, she went on, about a hundred miles farther, to the coast of Yucatan, and there fished for eight days; and that, on her return, when near Bahia Honda, on the coast of Cuba, she was captured, with her cargo of live fish, on April 27, 1898. These differences afford no ground for distinguishing the two cases.

Each vessel was of a moderate size, such as is not unusual in coast fishing smacks, and was regularly engaged in fishing on the coast of Cuba. The crew of each were few in number, had no interest in the vessel, and received, in return for their toil and enterprise, two thirds of her catch, the other third going to her owner by way of compensation for her use. Each vessel went out from Havana to her fishing ground, and was captured when returning along the coast of Cuba. T cargo of each consisted of fresh fish, caught by her crew from the sea, and kept alive on board. Although one of the vessels extended her fishing trip across the Yucatan Channel and fished on the coast of Yucatan, we cannot doubt that each was engaged in the coast fishery, and not in a commercial adventure, within the rule of international law.

The two vessels and their cargoes were condemned by the District Court as prize of war; the vessels were sold under its decrees; and it does not appear what became of the fresh fish of which their cargoes consisted.

Upon the facts proved in either case, it is the duty of this court, sitting as the highest prize court of the United States, and administering the law of nations, to declare and adjudge that the capture was unlawful, and without probable cause; and it is therefore, in each case,

*Ordered, that the decree of the District Court be reversed, and the proceeds of the sale of the vessel, together with the proceeds of any sale of her cargo, be restored to the claimant, with damages and costs.*

MR. CHIEF JUSTICE FULLER, with whom concurred MR. JUSTICE HARLAN and MR. JUSTICE McKENNA, dissenting.

The District Court held these vessels and their cargoes liable because not "satisfied that as a matter of law, without any ordinance, treaty or proclamation, fishing vessels of this class are exempt from seizure."

This court holds otherwise, not because such exemption is to be found in any treaty, legislation, proclamation or instruction, granting it, but on the ground that the vessels were exempt by reason of an established rule of international law applicable to them, which it is the duty of the court to enforce.

I am unable to conclude that there is any such established international rule, or that this court can properly revise action which must be treated as having been taken in the ordinary exercise of discretion in the conduct of war.

It cannot be maintained "that modern usage constitutes a rule which acts directly upon the thing itself by its own force, and not through the sovereign power." That position was disallowed in *Brown* v. *The United States*, 8 Cranch, 110, 128, and Chief Justice Marshall said: " This usage is a guide which the sovereign follows or abandons at his will. The rule, like other precepts of morality, of humanity and even of wisdom, is addressed to the judgment of the sovereign; and although it cannot be disregarded by him without obloquy, yet it may be disregarded. The rule is, in its nature, flexible. It is subject to infinite modification. It is not an immutable rule of law, but depends on political considerations which may continually vary."

The question in that case related to the confiscation of the property of the enemy on land within our own territory, and it was held that property so situated could not be confiscated without an act of Congress. The Chief Justice continued: " Commercial nations, in the situation of the United States, have always a considerable quantity of property in the possession of their neighbors. When war breaks out, the question, what shall be done with enemy property in our country, is a

question rather of policy than of law. The rule which we apply to the property of our enemy, will be applied by him to the property of our citizens. Like all other questions of policy, it is proper for the consideration of a department which can modify it at will; not for the consideration of a department which can pursue only the law as it is written. It is proper for the consideration of the legislature, not of the executive or judiciary."

This case involves the capture of enemy's property on the sea, and executive action, and if the position that the alleged rule *proprio vigore* limits the sovereign power in war be rejected, then I understand the contention to be that, by reason of the existence of the rule, the proclamation of April 26 must be read as if it contained the exemption in terms, or the exemption must be allowed because the capture of fishing vessels of this class was not specifically authorized.

The preamble to the proclamation stated, it is true, that it was desirable that the war "should be conducted upon principles in harmony with the present views of nations and sanctioned by their recent practice," but the reference was to the intention of the Government "not to resort to privateering, but to adhere to the rules of the Declaration of Paris;" and the proclamation spoke for itself. The language of the preamble did not carry the exemption in terms, and the real question is whether it must be allowed because not affirmatively withheld, or, in other words, because such captures were not in terms directed.

These records show that the Spanish sloop Paquete Habana " was captured as a prize of war by the U. S. S. Castine " on April 25, and " was delivered " by the Castine's commander " to Rear Admiral Wm. T. Sampson, (commanding the North Atlantic Squadron,)" and thereupon " turned over " to a prize master with instructions to proceed to Key West.

And that the Spanish schooner Lola " was captured as a prize of war by the U. S. S. Dolphin," April 27, and " was delivered " by the Dolphin's commander " to Rear Admiral Wm. T. Sampson, (commanding the North Atlantic Squadron,)" and thereupon " turned over " to a prize master with instructions to proceed to Key West.

That the vessels were accordingly taken to Key West and there libelled, and that the decrees of condemnation were entered against them May 30.

It is impossible to concede that the Admiral ratified these captures in disregard of established international law and the proclamation, or that the President, if he had been of opinion that there was any infraction of law or proclamation, would not have intervened prior to condemnation.

The correspondence of April 28, 30, between the Admiral and the Secretary of the Navy, quoted from in the principal opinion, was entirely consistent with the validity of the captures.

The question put by the Admiral related to the detention as prisoners of war of the persons manning the fishing schooners "attempting to get into Havana." Non-combatants are not so detained except for special reasons. Sailors on board enemy's trading vessels are made prisoners because of their fitness for immediate use on ships of war. Therefore the Admiral pointed out the value of these fishing seamen to the enemy, and advised their detention. The Secretary replied that if the vessels referred to were "attempting to violate blockade" they were subject "with crew" to capture, and also that they might be detained if "considered likely to aid enemy." The point was whether these crews should be made prisoners of war. Of course they would be liable to be if involved in the guilt of blockade running, and the Secretary agreed that they might be on the other ground in the Admiral's discretion.

All this was in accordance with the rules and usages of international law, with which, whether in peace or war, the naval service has always been necessarily familiar.

I come then to examine the proposition "that at the present day, by the general consent of the civilized nations of the world, and independently of any express treaty or other public act, it is an established rule of international law, founded on considerations of humanity to a poor and industrious order of men, and of the mutual convenience of belligerent States, that coast fishing vessels, with their implements and supplies,

cargoes and crews, unarmed, and honestly pursuing their peaceful calling of catching and bringing in of fresh fish, are exempt from capture as prize of war."

This, it is said, is a rule "which prize courts, administering the law of nations, are bound to take judicial notice of, and to give effect to, in the absence of treaty or other public act of their own government."

At the same time it is admitted that the alleged exemption does not apply "to coast fishermen or their vessels, if employed for a warlike purpose, or in such a way as to give aid or information to the enemy; nor when military or naval operations create a necessity to which all private interests must give way;" and further that the exemption has not "been extended to ships or vessels employed on the high sea in taking whales or seals, or cod or other fish which are not brought fresh to market, but are salted or otherwise cured and made a regular article of commerce."

It will be perceived that the exceptions reduce the supposed rule to very narrow limits, requiring a careful examination of the facts in order to ascertain its applicability; and the decision appears to me to go altogether too far in respect of dealing with captures directed or ratified by the officer in command.

But were these two vessels within the alleged exemption? They were of twenty-five and thirty-five tons burden respectively. They carried large tanks, in which the fish taken were kept alive. They were owned by citizens of Havana, and the owners and the masters and crew were to be compensated by shares of the catch. One of them had been two hundred miles from Havana, off Cape San Antonio, for twenty-five days, and the other for eight days off the coast of Yucatan. They belonged, in short, to the class of fishing or coasting vessels of from five to twenty tons burden, and from twenty tons upwards, which, when licensed or enrolled as prescribed by the Revised Statutes, are declared to be vessels of the United States, and the shares of whose men, when the vessels are employed in fishing, are regulated by statute. They were engaged in what were substantially commercial ventures, and the mere fact that the fish were kept alive by contrivances

for that purpose — a practice of considerable antiquity — did not render them any the less an article of trade than if they had been brought in cured.

I do not think that, under the circumstances, the considerations which have operated to mitigate the evils of war in respect of individual harvesters of the soil can properly be invoked on behalf of these hired vessels, as being the implements of like harvesters of the sea. Not only so as to the owners but as to the masters and crews. The principle which exempts the husbandman and his instruments of labor, exempts the industry in which he is engaged, and is not applicable in protection of the continuance of transactions of such character and extent as these.

In truth, the exemption of fishing craft is essentially an act of grace, and not a matter of right, and it is extended or denied as the exigency is believed to demand.

It is, said Sir William Scott, "a rule of comity only, and not of legal decision."

The modern view is thus expressed by Mr. Hall: "England does not seem to have been unwilling to spare fishing vessels so long as they are harmless, and it does not appear that any State has accorded them immunity under circumstances of inconvenience to itself. It is likely that all nations would now refrain from molesting them as a general rule, and would capture them so soon as any danger arose that they or their crews might be of military use to the enemy; and it is also likely that it is impossible to grant them a more distinct exemption."

In the Crimean War, 1854–5, none of the orders in council, in terms, either exempted or included fishing vessels, yet the allied squadrons swept the Sea of Azof of all craft capable of furnishing the means of transportation, and the English admiral in the Gulf of Finland directed the destruction of all Russian coasting vessels, not of sufficient value to be detained as prizes, except "boats or small craft which may be found empty at anchor, and not trafficking."

It is difficult to conceive of a law of the sea of universal obligation to which Great Britain has not acceded. And I

am not aware of adequate foundation for imputing to this country the adoption of any other than the English rule.

In his Lectures on International Law at the Naval Law College the late Dr. Freeman Snow laid it down that the exemption could not be asserted as a rule of international law. These lectures were edited by Commodore Stockton and published under the direction of the Secretary of the Navy in 1895, and, by that department, in a second edition, in 1898, so that in addition to the well-known merits of their author they possess the weight to be attributed to the official imprimatur. Neither our treaties nor settled practice are opposed to that conclusion.

In view of the circumstances surrounding the breaking out of the Mexican War, Commodore Conner, commanding the Home Squadron, on May 14, 1846, directed his officers, in respect of blockade, not to molest "Mexican boats engaged exclusively in fishing on any part of the coast," presumably small boats in proximity to the shore; while on the Pacific coast Commodore Stockton in the succeeding August ordered the capture of "all vessels under the Mexican flag."

The treaties with Prussia of 1785, 1799 and 1828, and of 1848 with Mexico, in exempting fishermen, "unarmed and inhabiting unfortified towns, villages or places," did not exempt fishing vessels from seizure as prize; and these captures evidence the convictions entertained and acted on in the late war with Spain.

It is needless to review the speculations and repetitions of the writers on international law. Ortolan, De Boeck and others admit that the custom relied on as consecrating the immunity is not so general as to create an absolute international rule; Heffter, Calvo and others are to the contrary. Their lucubrations may be persuasive, but are not authoritative.

In my judgment, the rule is that exemption from the rigors of war is in the control of the Executive. He is bound by no immutable rule on the subject. It is for him to apply, or to modify, or to deny altogether such immunity as may have been usually extended.

### Modification of Decree.

Exemptions may be designated in advance, or granted according to circumstances, but carrying on war involves the infliction of the hardships of war at least to the extent that the seizure or destruction of enemy's property on sea need not be specifically authorized in order to be accomplished.

Being of opinion that these vessels were not exempt as matter of law, I am constrained to dissent from the opinion and judgment of the court; and my brothers Harlan and McKenna concur in this dissent.

---

On January 29, 1900, the court, in each case, on motion of the Solicitor General in behalf of the United States, and after argument of counsel thereon, and to secure the carrying out of the opinion and decree according to their true meaning and intent, ordered that the decree be so modified as to direct that the damages to be allowed shall be compensatory only, and not punitive.