**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALEXIS HOLYWEEK SAREI; PAUL E.
NERAU; THOMAS TAMAUSI; PHILLIP
MIRIORI; GREGORY KOPA;
METHODIUS NESIKO; ALOYSIUS
MOSES; RAPHEAL NINIKU; GABRIEL
TAREASI; LINUS TAKINU, LEO WUIS;
MICHAEL AKOPE; BENEDICT PISI;
THOMAS KOBUKO; JOHN TAMUASI;
NORMAN MOUVO; JOHN OSANI; BEN
KORUS; NAMIRA KAWONA; JOANNE
BOSCO; JOHN PIGOLO; MAGDALENE
PIGOLO, individually and on behalf
of themselves and all others
similarly situated,
                 *Plaintiffs-Appellants,*

                   v.

RIO TINTO, PLC; RIO TINTED
LIMITED,
                 *Defendants-Appellees.*

No. 02-56256

D.C. No.
2:00-cv-11695-
MMM-MAN
Central District of
California,
Los Angeles

17563

ALEXIS HOLYWEEK SAREI; PAUL E.
NERAU; THOMAS TAMAUSI; PHILLIP
MIRIORI; GREGORY KOPA;
METHODIUS NESIKO; ALOYSIUS
MOSES; RAPHEAL NINIKU; GABRIEL
TAREASI; LINUS TAKINU, LEO WUIS;
MICHAEL AKOPE; BENEDICT PISI;
THOMAS KOBUKO; JOHN TAMUASI;
NORMAN MOUVO; JOHN OSANI; BEN
KORUS; NAMIRA KAWONA; JOANNE
BOSCO; JOHN PIGOLO; MAGDALENE
PIGOLO, individually and on behalf
of themselves and all others
similarly situated,
          *Plaintiffs-Appellees,*

       v.

RIO TINTO, PLC; RIO TINTED
LIMITED,
        *Defendants-Appellants.*

No. 02-56390

D.C. No.
CV-00-11695-
MMM
Central District of
California,
Los Angeles

ALEXIS HOLYWEEK SAREI; PAUL E.
NERAU; THOMAS TAMUASI; PHILLIP
MIRIORI; GREGORY KOPA;
METHODIUS NESIKO; ALOYSIUS
MOSES; RAPHEAL NINIKU; GARBIEL
TAREASI; LINUS TAKINU; LEO WUIS;
MICHAEL AKOPE; BENEDICT PISI;
THOMAS KOBUKO; JOHN TAMUASI;
NORMAN MOUVO; JOHN OSANI; BEN
KORUS; NAMIRA KAWONA; JOANNE
BOSCO; JOHN PIGOLO; MAGDALENE
PIGOLO, individually on behalf of
themselves & all others similarly
situated,
                    *Plaintiffs-Appellees,*

              v.

RIO TINTO, PLC; RIO TINTO
LIMITED,
                    *Defendants-Appellants,*

              and

UNITED STATES OF AMERICA,
                    *Movant.*

No. 09-56381

D.C. No.
2:00-cv-11695-
MMM- MAN
Central District of
California,
Los Angeles

ORDER

Filed October 26, 2010

Before: Mary M. Schroeder, Harry Pregerson,
Stephen Reinhardt, Andrew J. Kleinfeld, Barry G. Silverman,
M. Margaret McKeown, Marsha S. Berzon,
Johnnie B. Rawlinson, Consuelo M. Callahan, Carlos T. Bea
and Sandra S. Ikuta, Circuit Judges.

Order;
Dissent by Judge Kleinfeld;
Statement by Judge Reinhardt;
Dissent by Judge Callahan

**ORDER**

This case is referred to Judge Edward Leavy to explore the possibility of mediation. Judge Leavy is requested to report to the en banc court within twenty-eight (28) days as to whether mediation should proceed or whether this case should be returned to the en banc court.

---

KLEINFELD, Circuit Judge:

I respectfully dissent. We ought not to refer this case for mediation, for two reasons. First, we plainly lack jurisdiction. Second, referral for mediation would be imprudent even if we did have jurisdiction.

This is a class action. The plaintiffs are aliens, the defendants are aliens, and the events occurred abroad. The lawsuit arises out of events on the island of Bougainville in Papua New Guinea. The defendants are arms of Rio Tinto, a British-Australian corporation with headquarters in London and Melbourne, which has mined copper in the village of Panguna in Bougainville since 1972. The complaint alleges that Rio Tinto egregiously damaged the Bougainville environment and otherwise wronged the indigenous local people, sparking a civil war. According to the complaint, the Papua New Guinea government blockaded the island, causing thousands of deaths, and the violent civil war killed thousands more. The war ended in 1999. Rio Tinto allegedly participated with the Papua New Guinea government in war crimes. We are told that New Zealand mediated a peace agreement, under which Bougainville now enjoys some form of autonomy from the Papua New Guinea government as the "Autonomous Region of Bougainville." Bougainville is in the Pacific Ocean near (as distances in the Pacific go) Australia and New Zealand.

The named class plaintiffs include Alexis Sarei, a California resident alien when the complaint was filed (he is now

back in Bougainville as a member of its parliament) who alleges that he and a number of other Bougainville residents were victimized by Rio Tinto and the government both by violence and threats of violence, and by pollution from Rio Tinto's mine in Bougainville. The plaintiffs seek class certification for a "War Crimes Class" and an "Environmental Right to Life Class," to include more than 10,000 people who suffered from the civil war, the blockade, and the Panguna mine's environmental harms. They demand compensatory damages, punitive damages, and disgorgement of Rio Tinto's profits for the class.

We have not yet decided whether we have jurisdiction over this dispute. I very much doubt that we do. I suspect that we lack jurisdiction both because the case involves a political question and because we lack subject matter jurisdiction on account of extraterritoriality. This case is entirely extraterritorial. The claims are by Papua New Guineans against a British-Australian company for wrongs committed in Papua New Guinea. Although Rio Tinto has operations in many countries, including the United States, and Sarei lived in the United States as a resident alien when the complaint was filed, nothing done by Americans or in America, is at issue.

The Supreme Court recently reaffirmed in strong and plain language the rule against implied extraterritorial jurisdiction. "When a statute gives no clear indication of an extraterritorial application, it has none."[1] That case, like this one, involved extraterritorial conduct by and to persons who were not Americans. If anything, jurisdiction was not so plainly absent in that case as this one, since the theory was fraud on the market indirectly affecting Americans.[2] I suspect as well that this case is inextricably entwined with foreign policy determinations that are a political question.

---

[1] *See Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2878 (2010).

[2] *Id.* at 2875-76.

The statute at issue here is the Alien Tort Statute, promulgated in 1789.[3] It provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."[4] The statute does not say one way or the other whether the tort has to have been committed in America or by Americans. Since the statute "gives no clear indication of an extraterritorial application, it has none."[5] There are statutes that do apply extraterritorially, such as the Torture Victim Protection Act and the Extraterritorial Torture Statute, but they say so, and the Alien Tort Statute does not.[6]

For reasons that escape me, some seem to infer from the Alien Tort Statute's reference to "the law of nations" that it does not matter where the violation of the law of nations occurred.[7] Perhaps the implicit assumption is that no one in the United States would violate the law of nations. That, of course, would be nonsense. As the Supreme Court noted in *Sosa v. Alvarez-Machain*, the "law of nations" meant the common law that had developed around such international mercantile matters as bills of exchange, and "violation[s] of safe conducts, infringement of the rights of ambassadors, and piracy."[8] Until the Alien Tort Statute was promulgated, we

---

[3]28 U.S.C. § 1350.

[4]*Id.*

[5]*Morrison*, 130 S. Ct. at 2878.

[6]*Compare* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note (2006)) (creating a civil claim for the victims of state-sponsored torture or killing performed anywhere in the world), *and* 18 U.S.C. §§ 2340-2340A, 2441 (criminalizing torture performed anywhere in the world by an American national or performed by anyone within the United States, or war crimes committed by a member of the United States' armed services), *with* Alien Tort Statute, 28 U.S.C. § 1350 ("The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.").

[7]28 U.S.C. § 1350.

[8]542 U.S. 692, 715 (2004) (citing 4 William Blackstone, *Commentaries* *68) ("It was this narrow set of violations of the law of nations, admitting

suffered from an incapacity to deal with such matters as the Marbois Incident, where a "French adventurer" assaulted the Secretary of the French Legion in Philadelphia, and a "New York City constable produced a reprise of the Marbois affair," leading to a Dutch diplomatic protest.[9]

It is risible to think that the first Congress wrote the Alien Tort Statute intending to enable federal courts to adjudicate claims of war crimes committed abroad. Were it otherwise, a French aristocrat who had escaped the guillotine and fled to Philadelphia could have sued French defendants in our newly organized federal courts, perhaps even Robespierre himself, and obtained an injunction commanding the bloody French revolutionaries to stop immediately. Perhaps we should have mediated the French Revolution, or issued a preliminary injunction to maintain the status quo while we decided whether we had jurisdiction? This silly hypothetical would be analogous to our adjudicating or mediating the class action claims in this case. The point of the Alien Tort Statute was to keep us out of international disputes, not to inject us into them.

Our authority to refer parties to mediation arises out of Federal Rule of Appellate Procedure 33. "The court *may direct* the attorneys — and, when appropriate, the parties — to participate in one or more conferences to address any matter that may aid in disposing of the proceedings, including simplifying the issues and discussing settlement."[10] Two words, "direct" and "may," are especially helpful in figuring out how this rule should apply to this case.

---

of a judicial remedy and at the same time threatening serious consequences in international affairs, that was probably on minds of the men who drafted the A[lien ]T[ort ]S[tatute] with its reference to tort."); *see also The Paquete Habana*, 175 U.S. 677, 686 (1900); *The Amiable Nancy*, 16 U.S. (3 Wheat.) 546 (1818).

[9]*Sosa*, 542 U.S. at 716-17.

[10]Fed. R. App. P. 33 (emphasis added).

For a court to "direct" anyone to do anything, it needs jurisdiction over the subject matter and the party. It would be absurd to infer from the word "direct" that we could command people to do things in the absence of any authority over the persons or subject matter. For example, had the plaintiffs also sued the governments of Papua New Guinea, Bougainville, and New Zealand, with each asserting sovereign immunity, our mediation order implies that we could "direct" these governments to negotiate settlement before deciding upon their claims that we lacked any jurisdiction over them. As a court of limited jurisdiction, however, we "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree."[11] Though there is no authority on point, I am inclined to think that because we can "direct" mediation under the rule, it is implicit in the rule that where jurisdiction is in grave doubt, jurisdiction must be established prior to the exercise of judicial commands to the parties to do anything that may substantively affect them.[12]

The second critical word in our mediation rule is "may." The word "may" implies discretion. Even if we somehow had authority to direct parties to do anything when we lacked jurisdiction over the case and over the subject matter of their dispute, it would be imprudent to exercise that power here.

---

[11]*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted).

[12]Judge Reinhardt takes the position, incontrovertibly true but nevertheless irrelevant, that a court has jurisdiction to decide whether it has jurisdiction. *See* Judge Reinhardt Statement at 17574. He goes on, incorrectly, to infer from the injunction to maintain the status quo issued in the United Mineworkers' strike pending the Court's decision on subject matter jurisdiction under the Norris-LaGuardia Act, *see United States v. United Mine Workers*, 330 U.S. 258, 292-93 (1947), that courts may issue injunctions in *any* circumstance prior to determining whether they have jurisdiction, *see* Judge Reinhardt Statement at 17574, and then leaps again from this proposition to the conclusion that federal courts must likewise have the power to direct parties to mediate regardless of jurisdictional concerns. I hope to have Judge Reinhardt as a companion the next time I need to cross a river in the absence of a bridge.

Judge Reinhardt seems to think I am critical of mediation or our mediator. Far from it. The problem with mediation in this case is not that it is ineffectual, but rather that it is likely to have great influence because of its high quality. And these are not matters that we ought to influence, especially before deciding whether we have jurisdiction. "It is generally imprudent to exercise all the power we may have, or to test the limits of our power, and it is highly imprudent in this case."[13]

We are asked to adjudicate a foreign company's participation in Papua New Guinea's civil war, a war that has evolved into a delicate compromise between the Papua New Guinean government and the Region of Bougainville. Upsetting the compromise negotiated by New Zealand runs the risk of reigniting the civil war. The central government and the autonomous region may both be happy now with the idea of local people getting some much needed money from a multinational corporation. But once the litigation train starts down the track, it is hard to stop, and it is impossible to foresee its consequences. Perhaps conflict may rear its head once more if the class action produces a big bundle of money, and the time comes to sort out who gets how much of it. Violence may be used by parties with an interest to influence the mediation in one direction or another, to sabotage it, or to prevent a party from withdrawing from it, as often occurs in negotiations between Israel and the Palestinians. This is, after all, a lawsuit about a civil war.[14]

Nor is it necessarily the case that settlement here would be a good thing. Sometimes settlement produces a just compro-

---

[13]*Nw. Env't Advocates v. EPA*, 340 F.3d 853, 855 (9th Cir. 2003) (Kleinfeld, J., dissenting), *cited in Horne v. Flores*, 129 S. Ct. 2579, 2594 (2009).

[14]Judge Reinhardt tells me I can "rest assured" that nothing bad will happen on account of mediation. Judge Reinhardt Statement at 17575. How would he know? I do not know whether mediation will cause problems in that faraway land. Unlike my colleague, I know that I do not know.

mise, sometimes an unjust compromise. The Democratic Party's platform in 1864 took the position that "after four years of failure to restore the Union by the experiment of war," the conflict ought to be settled instead by peaceful agreement.[15] That would have avoided vast additional bloodshed, but would have entailed a continuation of slavery, at least in some parts of the slave states, for many more years.

Settlement is a means of achieving docket control and compromise, and sometimes, but not necessarily, a means of attaining justice.[16] When a typical construction dispute is settled, that is usually a good thing, because there is usually right on both sides. But when an innocent man pleads guilty to a misdemeanor to avoid the risk of a felony, or when a carpenter accepts $5,000 on a perfectly good $15,000 Miller Act claim to avoid the expense of litigating against the bonding company, these are bad things. This dispute about a mine and civil war in Papua New Guinea is not a typical construction dispute. This case involves a delicate matter of a foreign war and a foreign peace, combined with an effective procedural device for taking very large sums of money from deep-pocket defendants, the class action. Mediation promotes compromise, but we have no idea whether it is just or unjust to transfer money from Rio Tinto to the proposed plaintiff classes. Pushing for a settlement in these circumstances, where jurisdiction is most probably lacking and where there are far more appropriate jurisdictions that may choose whether to entertain the lawsuit in its current form, would be imprudent to the point of being an abuse of discretion. These are sophisticated parties who, if they want to settle, can do it on their own.

---

[15]Chandos Fulton, *The History of the Democratic Party: From Thomas Jefferson to Grover Cleveland* 446 (1892).

[16]*See* Owen M. Fiss, *Against Settlement*, 93 Yale L.J. 1073, 1085-86 (1984) ("Parties might settle while leaving justice undone. . . . Although the parties are prepared to live under the terms they bargained for, and although such peaceful coexistence may be a necessary precondition of justice, and itself a state of affairs to be valued, it is not justice itself." (footnote omitted)).

If we proceed with ordering mediation in a foreign dispute where we probably lack jurisdiction, why stop with Papua New Guinea? As I walk to our courthouse in San Francisco, passing one store selling carpets from Kashmir, one with kilims from Afghanistan, and a Palestinian-owned hotel, I see possible class actions right and left. There are so many places with potential plaintiffs who may very well be resident aliens just as Sarei was, and plenty of possibilities for alleging human rights violations that harmed enough similarly situated people to satisfy Civil Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation.[17] Perhaps we could succeed where the State Department has not. But nothing could more clearly be a political question, consigned to the political branches of government, than the settling of foreign disputes between foreigners arising out of conduct in foreign lands. Such cases do not fall within our jurisdiction unless Congress assigns them to us.[18]

The Alien Tort Statute was promulgated as a means of keeping us out of foreign conflicts. Converting the statute into a device for benevolent imperialism to advance human rights (or class-action tourism) enmeshes our country in foreign conflicts outside of this court's authority.

---

[17]*See* Fed. R. Civ. P. 23(a); *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 598-615 (9th Cir. 2010) (en banc).

[18]*See, e.g.*, *Sosa*, 542 U.S. 692, 728 (2004) (describing for example, the Torture Victim Protection Act of 1991 as "a clear mandate . . . providing authority that 'establish[es] an unambiguous and modern basis for' federal claims of torture and extrajudicial killing." (quoting H.R. Rep. No. 102-367, pt. 1, p.3 (1991))).

Statement of REINHARDT, Circuit Judge, in which PREGERSON, McKEOWN, BERZON, and RAWLINSON, Circuit Judges, join:

I write to respond briefly to Judge Kleinfeld's dissent from our non-dispositive order referring this case to Judge Leavy to explore mediation for twenty-eight days. Judge Kleinfeld is simply wrong to assert that we must *first* determine whether we have subject matter jurisdiction before we may direct that the parties explore mediation. It is among the most elementary principles of federal jurisdiction that "a federal court always has jurisdiction to determine its own jurisdiction." *United States* v. *Ruiz*, 536 U.S. 622, 628 (2002). While we are properly exercising our jurisdiction to decide, among other issues, whether we have jurisdiction here, we may take any non-dispositive action we deem prudent or necessary. We could, for example, issue and enforce an injunction to preserve the status quo, even if it later turned out that we lacked jurisdiction all along. *See United States* v. *United Mine Workers*, 330 U.S. 258, 292-293 (1947). Referring a case to mediation prior to our deciding the issues presented, as is permitted by the Federal Rules and our Circuit Rules, is no different.[1] It is hardly anomalous that we refer this case to mediation while jurisdictional issues are pending; indeed, we often do so in immigration cases, sometimes with success.

Our court has long been a pioneer in the field of appellate mediation, and we take great pride in our efforts to aid parties in finding resolution outside the courtroom and beyond the pages of the Federal Reporter.[2] Because mediation allows for

---

[1] Federal Rule of Appellate Procedure 33 states, "The court may direct the attorneys — and, when appropriate, the parties — to participate in one or more conferences to address any matter that may aid in disposing of the proceedings, including simplifying the issues and discussing settlement. . . ." Under our Circuit Rule 33-1, such "appellate conferences" may take the form of mediation.

[2] *See, e.g.*, Judge J. Clifford Wallace, *Improving the Appellate Process Worldwide Through Maximizing Judicial Resources*, 38 VAND. J.

compromise and creativity in a way that litigation cannot — circumscribed as it is by procedure and precedent — parties have often found that mediation provides more satisfactory relief than the court could fashion itself. Today we turn to our colleague, Judge Edward Leavy, who has mediated many significant disputes, such as a suit by sixty victims of clergy sex abuse against the Archdiocese of Portland, the largest investment manager fraud case in American history, and the criminal prosecution of nuclear scientist Wen Ho Lee, in which Judge Leavy succeeded in negotiating a plea agreement between the defendant and the Department of Justice. Although Judge Kleinfeld is anxious to decide the technical legal questions presented to us, I am pleased that most of my colleagues are willing to allow Judge Leavy a brief opportunity to determine whether the parties can arrive at a mutually satisfactory resolution to this case, which has been pending in the federal courts for ten years and which may well, following a decision by this court, require years more of litigation.

Our dissenting colleague is concerned that mediation may be successful. Let us hope that he is right. He can rest assured, however, that, whatever the outcome, it will not "reignit[e] the civil war," or cause any other disruption of international affairs; nor, certainly, will the mere undertaking by Judge Leavy of the task he has so graciously agreed to perform. We can only wish that this court were as powerful or effective as Judge Kleinfeld suggests. If the mediation succeeds, we will simply have helped to resolve a complex legal dispute of great importance to the various litigants by means of a peaceful settlement rather than through extended litigation. In such case

TRANSNAT'L L. 187, 204-208 (2005); Judge Dorothy Wright Nelson, *ADR in the Federal Courts — One Judge's Perspective*, 17 OHIO ST. J. ON DISP. RESOL. 1 (2001); *see also* Claudia Bernard, *Mediation in the Ninth Circuit Court of Appeals*, FED. LAW. (May 2009), at 41; Lisa Evans, *Mediation in the Ninth Circuit Court of Appeals*, 26 JUST. SYS. J. 351 (2005); S. Gale Dick, *The Surprising Success of Appellate Mediation*, ALTERNATIVES TO HIGH COST LITIG. (April 1995), at 41.

we will be able to take great satisfaction from what we have accomplished as members of the federal Judiciary.

---

Callahan, Circuit Judge:

I also dissent from our order referring this matter to mediation. In light of the substantial questions concerning our jurisdiction over the underlying controversy, the nature of the controversy, the nature of the legal issues presented in this appeal, as well as the passage of time since the inception of this litigation, I question whether the reference to mediation is appropriate at this juncture.